of Homeland Security, Al-Hasani v. Secretary US Department of Homeland Security, Al-Hasani Good morning, Your Honors. May it please the Court, my name is Benjamin Cooper, pro bono counsel on behalf of the appellant, Muhaddid Al-Hasani. I'd like to reserve three minutes for rebuttal. Al-Hasani is an internationally renowned human rights lawyer who put his life on the line in opposition to the Assad regime to better human rights in Syria. He was granted humanitarian parole, asylum, and legal permanent residency with the assistance of the US government when he fled here in the dead of the night after being named in WikiLeaks as an intelligence source on Syrian human rights violations for our embassy in Damascus. He disclosed the legal status of his two separate successive marriages to the US government at every step of the way, but now has been told by USCIS that he does not have good moral character because in their view, he is a polygamist. The district court agreed with this view and applied the wrong legal standard under section 212-210A of the INA to the undisputed and uncontroverted facts of this case, which made clear that he did not come to the United States to practice polygamy. For these reasons, the district court decision should be reversed. The key issue in this case, Your Honors, is good moral character and what it means to come to the United States to practice polygamy. Isn't one of the key issues also how we evaluate this case, whether we do de novo review or whether we owe the INS Chevron deference? It is, Your Honor, and we think in this case you should be doing de novo review of the Chevron deference as appropriate. I'm happy to speak to the Chevron issue if you'd like, but I think if we focus on the statutory text alone, which is unambiguous, that is sufficient. Okay, but is that necessarily the choice? I mean, if the statute, if we, if the agency is, here is, Congress, this is the agency should interpret this statute under that language. Shouldn't we apply Chevron deference and then look under that framework to determine whether or not the statute was ambiguous first? Shouldn't that be our first step? Well, I think in the first step of the Chevron analysis, Your Honor, you need to look whether there is an ambiguity in the statute. What do you think about that? Any ambiguity? I don't view that there's ambiguity, and I'm happy to get into a discussion of why there's  Yes, and what is, in your view, the one clear meaning of to practice polygamy? Well, so to practice connotes some level of actual activity, and what the government is trying to do is read that verbiage as well as coming to the United States out of the statute. And that's just, you know, inconsistent with fundamental canons of statutory construction. The district court also correctly recognized that to practice polygamy requires something more than the passive state of being legally married to more than one person at some time. Or they recognized, rather, that it requires some level of actual activity. What definition of polygamy do you suggest that we adopt? There's a variety of definitions of polygamy. The district court relied on Black's Law Dictionary, but there's no definition of polygamy in the statute, and thus no controlling definition. Isn't the Black's definition is the state of being married to two spouses at the same time, right? I believe it's the state of practice. There's an alternative there, right? One being the state, which sounds to me like a passive thing. Right. I think the key distinction here is status versus practice. Okay, so how do we inquire about one's sex life and home life? Or do we just say how many marriages are you in at the same time? Well, I think what you need to do, Your Honor, is you need to situate the concept of polygamy within the full language of the statute itself, which is an immigrant who is coming to the United States to practice polygamy. We suggest that to come to the United States and to practice connotes its actual activity beyond mere status, and it suggests some prospective future-looking activity rather than retrospective and things that may have occurred prior to his coming here. If someone comes here intending to maintain his two marriages, how does that cut? Well, so I think the facts of this case here are very important, and I'm happy to go through them if you'll just afford me the opportunity, which is that al-Hassani was a human rights activist in Syria, and he was in prison for two years, and he was under a travel ban for five years. His wife, his first wife, when she was pregnant, she moved to Morocco because al-Hassani did not believe that he would be able to live an ordinary life as a human rights activist, and she was gone. He was then subjected to a travel ban, not thinking he would ever be able to see his first wife again, married his second wife, had a second son, was then imprisoned, and then had to flee here overnight when he was named as a U.S. intelligence source. So he had the status of these two marriages, but here's what I can tell you did not happen in this case. He never cohabitated with either wife at the same time. He never lived in the same country with the same wife at the same time. He did bring his first wife and his child to his first wife to America. He did bring his first wife here, who he hadn't seen since 2004, and that is because when he finally was granted asylum here and he was afforded an opportunity to travel for the first time in, I believe, seven years, he went to Morocco to meet his first son who he hadn't seen since he was an infant, saw that they were living in terrible conditions, petitioned for them to come over here. They cohabitated in the U.S., which afforded him an opportunity to raise his son, Your Honor, but he never lived in a marital relationship with her. Well, he had that second wife in Syria. Yeah, and when he came to the United States, his marriage to her had already ruptured. It had ruptured as a result of his imprisonment where he'd been there for two years, and she decided to stay in Syria. She made clear that she would never come to the United States. You can find all of this in the record at 86 through 93. He has not seen her in – go ahead. I just wanted to go back to when you said he cohabited with his first wife, but they didn't live in a marital relationship. So are we to draw a line? Where could we draw a line about what is living in a marital relationship, particularly within a home? Well, I think what I would – one way to answer that question is where you should not draw the line, and this is what the district court looked to as indicia of the practice of polygamy, and that was maintaining phone contact and sending money to his children for their care and maintenance. And the phone contact was so that they could raise their minor child while he was living in a different country, and the money was provided as a means of maintenance. And I think it's important to recognize that using those two factors is difficult when you consider that he likely would have been legally required to do so had he been divorced as a matter of alimony or child support. So we're not asking that you draw a bright-line rule in which you have to say X, Y, or Z meets the standard, but what we are asking is that it needs to be something more than the passive state of being in two marriages or supporting your children. When John Adams lived in London and Paris for five years from 1779 to 1784, was he still active in practicing his marriage with Abigail? Honestly, Your Honor, I can't speak to what activities John Adams was doing then. They didn't see each other for five years. They didn't see each other for five years. Well, I would assume that John Adams at no point told his wife, Abigail, we're not seeing each other anymore, I'm never going to see you again, I'm not coming home, we're never going to live in marital union again. I don't think any of those things were expressed. There was nothing clear between John Adams and Abigail suggesting that the relationship had ruptured and was over. So if you look at the statutory history, the earlier iterations of the law referred to people who support or advocate for polygamy, and then the final version, support, advocate, or practice. And then in 91, Congress eliminated support and advocate, so we're left with practice. Right, and I think that's an excellent point, one that I was planning to turn to, Your Honor, which is that the government is essentially arguing that we're under a different standard here. If you look to what it was in 1952, it was aliens who are polygamists or who practice polygamy or who advocate the practice of polygamy. None of which is going on here. Al-Hassani came here for reasons having nothing to do with his marriages. He came here not ever thinking he would have to come here. He came as an asylee. But if the test is that subjective, then wouldn't every person, every alien who comes here saying, I swear I'm not coming here to practice, I'm coming because my life was bad back where I came from. No, but I didn't come here to practice polygamy. We'd never find one who says that. That's right, but I think that there is activity that could occur in the United States that's suggestive or would qualify as practicing polygamy that we simply don't have here. He has just the mere legal status of two marriages. He sends money. He talks to them on the phone. These were for minor children during the statutory period. And he brought his wife and his son over here for a period of time when he saw the conditions they were living in Morocco. And then they returned home when the mother's mother was dying. If we were to accept your proposition that he was not practicing polygamy at the time of his application for naturalization, what happens if five years from now he decides that he wants to practice polygamy, he wants to have active marital relationships with both wives? I understand he was recently divorced, but in this hypothetical, let's assume he was not. Would there be anything to bar that? Assuming he was granted naturalization or assuming he was granted naturalization, well, I think there are laws against polygamy, so I think he would certainly be prohibited from doing it in that sense. Although you say he has legal marriages in other countries and, you know, he could, you know, let's say in these hypotheticals those remain valid. If those marriages remain valid, well, Your Honor, I don't think there's anything legally that prevents a citizen from going to another country and marrying someone else. So in your hypothetical, I'm just not sure that that captures any citizens from engaging with that. Could he, if, you know, Mr. Hassani were still legally married in other countries to two wives, and five years from now, could he bring them both to the United States and decide to have active relationships with both? Certainly not. I mean, being a polygamist here is. Would he then become a bigamist? I think what we're actually, you know, looking at here, Your Honor, in terms of what his status is, is one of more, it tracks closer to bigamy, which is where you have a wife and you marry someone else while that first wife is actually living. When you look at the definitions of polygamy, all of which incorporate things like custom or practice or status, it's a much broader scope, and that dates back to a long history of Mormonism in that country. And that is what the statute was originally designed to forbid. But I mean, it encompasses more than one, right? The definition in the Black Squad Dictionary is married to more than one spouse at once. Would you agree with that? So it's two or more? Two or more, yes. Okay. So two spouses could satisfy the definition of polygamy as used in this statute? Well, there's no definition of polygamy in the statute itself. The definition of polygamy as the term polygamy is used. Correct. Being married to two people could qualify as polygamy, but you need to situate that, though, within the language of the statute, which is important here. It is one who is coming to the United States to practice polygamy. And why isn't enough just to come here while intending and then actually maintaining more than one marriage at the same time? I think in this instance, he maintained the two marriages because he had two sons who he was unable to see for years at a time. And he did not want to divorce the – let me step back for a second, which is to note, he could not divorce his second wife in any jurisdiction. So that's simply off the table because he's unable to affect legal process in Syria and because New Jersey doesn't recognize the second marriage. He didn't want to divorce his first wife because having been separated from his child for a period of seven years, eight years, he didn't want to treat that child differently than his second son. And this is – it's a dynamic that's not specific to Syria or Morocco, but it's one that arises commonly enough in the United States in a case of divorce and remarriage. And he simply just didn't want to have his first son feel the effect of that. I get it. It sounds like for good and maybe in his mind legitimate reasons, he wanted to be in a state of polygamy. He wanted to take care of his children, and that is what he did. By sending them money, by speaking to them on the phone, and by the mere fact that he was legally in two marriages at the same time and unable to effectuate a divorce from one of them, we don't think under the clear statutory text connotes actual activity and furtherance of polygamy. I guess I don't know how we can possibly look beyond status. I mean, people are in marital relationships all over the place with lots – you know, they don't get along. They get along great. They have all kinds of – a million different varieties of how marriages look. But we just say to each other, do you have the status of being married? Okay, you're married. We don't say, tell me about your marriage, and I'll tell you whether you're really practicing that marriage. We just say, you're married? Okay, you're married. And in this instance, he was married, but keep in mind, Your Honor, that the second wife has no nexus whatsoever to this country. Yeah. She's always been in Syria. She's never intended to leave Syria. The only connection that she has is him sending money and picking up the phone and trying to speak to his kid. I guess my point is I don't know how, when we consider what it means to practice polygamy, we can really look beyond status. Can you help me to – We're not asking you to draw a bright-line rule. One way or the other is what will hit that threshold. But we are asking, and we think the statutory text suggests that it requires some intentionality, some degree of purpose, and the passive state of being in two marriages isn't enough. And we also ask that you find that child care should not be considered indicia of the practice of polygamy. I see my time's up, so thank you, Your Honor. Next, Nisa Ahmed. Good morning, and may it please the Court, I'm Nisa Ahmed for the United States. Your Honors, in the course of setting eligibility requirements for U.S. citizenship, Congress determines that a naturalization applicant is statutorily barred from a finding of good moral character necessary for U.S. citizenship if that applicant has practiced polygamy during the statutory period. The statutory period extends backwards looking, it's retrospective, and extends five years prior to the date of application and through the adjudication period of that application. Because Mr. Al-Hassani was married unequivocally to both of his wives during the relevant statutory period here, which extends from September 11, 2012, through March 17, 2020, he was practicing polygamy and USCIS properly denied his naturalization application. Just to ask you a question, I ask counsel on the other side, do we review this case with Chevron deference or is this just a statutory interpretation for us? The government's position is that the statute is unambiguous when the INA is read as a whole. It doesn't matter? So you say it doesn't matter, really? That would be correct. I mean, to the extent that this Court, of course, finds that there is an ambiguity, then USCIS's regulation is due Chevron deference. But because it's unambiguous, we don't give Chevron deference? You don't need to read it, no. That's good. But what about the series of changes that took place in the statute over a period of, well, since what, 1891? Yes. And the major change in 19, I think, 90. 1990. You're talking about the change? Yes. Does that, you know, does that leave us with some ambiguities? The government's position is that it does not, just because the purpose of the good moral character evaluation is inherently backwards looking. And so a common sense reading of the statute would say, just because there is a present tense verbiage in 1182, that is not the end all be all of the evaluation for good moral character. Well, it's also it's a future looking language, right? To practice polygamy in the future. Yet we have to look at that five year statutory period preceding the date of the application. So how do you reconcile that? Because the provision in 1182 that says is coming to the United States to practice, talks about admissibility for the purposes of visa and admission into the United States. And so the provision that describes good moral character in 8 U.S.C. 1101F3 discusses and incorporates by reference 1182A10A, which is that forward looking that includes that forward looking language, but specifically says whether inadmissible or not. So the evaluation for good moral character incorporates the evaluations at forth in those cross reference sections, but also includes more. It's an older case. In fact, it's a 1953 case. But this case of matter of G. You treat a G more favorably than you're proposing to treat this petitioner, Mr. Al-Hassani. Sure. So there are a few distinctions there. First, the case is from 1953, so it predates a lot of the amendments that are in effect now. But I think most telling is that that case in corporate involves an evaluation of a criminal charge of bigamy. And this case, we're dealing with the civil issue of polygamy. So that there was potentially a higher bar for that criminal case is is natural. So you said earlier that because Mr. Al-Hassani was married, he was practicing polygamy. But that's really the whole crux of the debate, right? Yes. Why was he practicing polygamy? Merely because he had previously been married twice. That is correct. The government's position is that the fact that he maintains legal marriages to both of his wives is practicing polygamy. The government is wary and incredibly cautious with creating an evaluation of any sort, some sort of test to determine or to look into the intimacies and the intricacies of any type of relationship, of the marital relationship. Don't you have to use the regulation, which you can properly use, as opposed to the statute? Because it seems to me the statute says any immigrant who's coming to the United States to practice polygamy. Certainly, Mr. Al-Hassani didn't come here to practice polygamy. He came here to escape the treatment he was getting in Syria. Sure, of course. And again, the good moral character provision incorporates, by reference, that 1182 forward-looking language. But because the good moral character evaluation is necessarily backwards-looking, it also includes the regulation, USCIS's regulation, which includes has practice or is practicing polygamy. So it does include – so it references the past tense, previous behavior, and current behavior. But you ignore the words coming to the United States? We don't. We just say that it's not – the government's position is that it's not – that it's not telling, that it's not the end of the inquiry, that there is more for the good moral character evaluation. Well, so Mr. Al-Hassani was in the United States, right? So any language about coming to the United States wouldn't apply to him in any case. That is correct. Okay. So how are we to interpret this when someone's applying for naturalization and is already here as Ms. Haile? Sure. So AUSC 1427A describes the requirements for naturalization. And the first element is for an applicant to have obtained a legal permanent residency. And then there's a residency requirement in terms of temporal residency, which is five years prior to the application. And then there's the additional evaluation of good moral character, which extends backwards. So that he's already here doesn't necessarily matter because we are looking at his behavior prior to his application and then through the application process. Now that he is divorced in New Jersey, is there any way that he could become naturalized in the future? He is not barred from applying for naturalization in the future from five years from the date of his purported divorce. To that extent, if he is still only married to just his second wife, then the polygamy bar would in theory no longer apply. So as long as he meets those other elements of naturalization, he could be eligible for citizenship. Sure. So we don't want to look at people's personal lives to determine whether they're practicing polygamy. But what about trying to determine their intent when they come here? And we ask whether they came here to practice polygamy or to escape a bad situation somewhere else. Or, you know, people come here for a lot of different reasons. For multiple reasons at the same time, right? Sure. Well, for the purpose of citizenship, for the good moral character evaluation, which is what is at issue here, intent doesn't necessarily matter. We're reading, I think, too much into the intent or into sort of a purpose or intent requirement in 1182, if there is one that exists, which the government maintains there is not. But also just because somebody has an intent of escaping a terrible situation does not also mean that they don't intend to practice polygamy here. Mr. Al-Hassani maintained his marriages throughout the relevant time period. And that is enough to show that he intended to maintain, to practice polygamy in the United States. If you say I'm going from Washington up to Philadelphia to argue a case before the Third Circuit, doesn't that come out some kind of intention? Why you're coming here? Sure. But I could also have dual intentions in coming here as well. Okay. Anything else? Mr. Cooper. Thank you. I just wanted to briefly address the point that my friend here was making with respect to Mr. Al-Hassani's ability to reapply for citizenship in five years once he's met their view of the statutory requirements. I'd ask that you keep in mind that he's a stateless person as a result of his assistance to the United States government in providing intelligence related to human rights activities. As a stateless person, he wants to be able to have things like voting rights and other opportunities afforded to him by citizenship. And also if you look at the record in Appendix 87, Paragraph 12, he goes on in great detail about how much respect and admiration he's had for the United States his entire life, as well as how deeply appreciative he is to this country for its help in bringing him here and bringing his mother here and bringing his brother here, who are all at risk as well. And I also just wanted to briefly touch on one other point, which is looking at a few of the other provisions of categories of persons who are barred under the statute from coming here. Several of those have – so let's take a look at Section 1182A2C, and that defines controlled substance trafficker. And I think that's a category of a person that is illegal in virtually every country in the world. That section precludes naturalization for any citizen who is or has been an illicit trafficker in any controlled substance or in any listed chemical or is within the nuclear family of such a prohibited noncitizen and has within the last five years obtained any financial or other benefit from the illicit activity. So there's a few things going on here. One, is or has been makes clear that it is not what you are going to do. It is not this prospective focus, for instance, come to the United States to practice polygamy, but rather whether you have at any time or currently are a controlled substance trafficker. And second, unlike the polygamy statute, there's no jurisdictional hook. There's no nexus to the United States under this provision. So, for instance, one seeking to naturalize could have trafficked in controlled substances entirely outside of the United States and would still be prohibited under the statute. And these are very critical differences from our statutory language here. So for all these reasons that I've stated today, and unless your honors have any further questions, we ask that you reverse the district court and find that al-Hassani did not come to the United States to practice polygamy and was of the good moral character required under the statute. Thank you. Thank you. I'll take that under advisement.